IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 15, 2007

## WILLIAM DOUGLAS ZUKOWSKI v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-C-1515     J. Randall Wyatt, Judge**

_____

**No. M2006-02083-CCA-R3-PC - Filed January 9, 2008**

_____

The petitioner, William Douglas Zukowski, was convicted of five counts of rape of a child and sentenced to twenty-five years on each count, to be served consecutively for a total effective sentence of 125 years. He later pled guilty to three additional counts of rape of a child and one count of aggravated rape and accepted a sentence of twenty-five years, to be served concurrently with his prior sentence. On direct appeal, this court affirmed his convictions. In his petition for post-conviction relief, the petitioner contends he received ineffective assistance of counsel. After review, we affirm the judgment from the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

John T. Harding, Nashville, Tennessee, for the appellant, William Douglas Zukowski.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In 2001, the petitioner was convicted of five counts of rape of a child and later pled guilty to three additional counts of rape of a child and one count of aggravated rape. He received a total effective sentence of 125 years in confinement. On May 18, 2004, after an unsuccessful appeal of his convictions, the petitioner filed a pro se petition for post-conviction relief. He was appointed counsel and filed an amended petition for post-conviction relief on May 17, 2006. Following a hearing on August 24, 2006, the post-conviction court entered an order denying any relief.

The facts of the case were provided by this court on direct appeal.

Deborah Gail Mayberry, a special education teacher at McMurray Middle School, testified that she had been a teacher for four years and that prior to teaching, she had been a special education assistant for eighteen years. She stated that she had taught eighth and ninth grades at McMurray for the past two years. Mayberry testified that there are three different classifications for the special education students at McMurray Middle School. According to Mayberry, McMurray offers a "life skills" class for children who are "very low functioning," five resource classes for children who "are a little lower academically than the other students," and a "Moderate Intervention Program for fragile children." She testified that she taught the Moderate Intervention class and explained that the class is for children of varying academic levels who have emotional issues.

Mayberry testified that she taught the victim during the 1999-2000 academic year. She stated that the victim was in the seventh grade and that the victim was moved from one of the resource classes to her class around January 2000. Mayberry stated that she thought the victim had just turned twelve years old when she entered her class. She testified that the victim was academically very low functioning, that she was probably functioning at about a third or fourth grade level, and that she was also mildly mentally retarded. According to Mayberry, in order to be classified as mildly mentally retarded, a child must academically function significantly lower than his or her peers, and he or she must also have an extreme deficit in two adaptive areas such as social skills, community involvement, self-care, family participation, or the ability to make friends. She testified that mildly mentally retarded children also have difficulty with reasoning and abstract thinking.

Mayberry testified that the victim was in her classroom all day. She described the victim as "a very sweet child" who "loved everybody." Mayberry stated that the victim "trusted everybody" and could sometimes be "too trusting" of people. She also stated that the victim was truthful. Mayberry testified that the victim finished the seventh grade at McMurray and then transferred to another school the next year. Mayberry testified that in the spring of 2000, she made a referral to the Department of Human Services regarding the victim, and someone from the Department of Children's Services visited the school.

On cross-examination, Mayberry maintained that the victim was very truthful and trusting. She testified that the victim's memory regarding life experiences seemed to be "pretty good." Mayberry testified that the victim often repeated the same stories. She acknowledged that she did not know the accuracy of the victim's stories.

The victim testified that she was fourteen years old and that she was born on December 5, 1986. She stated that she was in the eighth grade and that she lived with her Aunt Carol, to whom she referred as "mom." The victim testified that the

[petitioner] is her uncle and that he was married to Carol. She recalled that when she was in the seventh grade, she attended McMurray Middle School, where Ms. Mayberry was her teacher. She reported that when she attended McMurray, she was living in a house on Patterson Street with the [petitioner]; his wife, Carol; and the victim's brother, Chris. The victim identified the [petitioner] in court.

The prosecution showed the victim a picture of a female. The victim testified that the girl in the picture was not wearing clothes. The victim identified several parts of the girl's body, including the breasts (which she referred to as the chest), the vagina (which she referred to as the "front private"), and the "butt." The prosecution then showed the victim a picture of a man. The victim stated that the man was not wearing clothes. She then identified several parts of the man's body, including the chest and the penis (which she referred to as the "front private").

The victim acknowledged that she knew the difference between "a good touch and a bad touch." She stated that a teacher patting her on the back would be a "good touch." However, she testified that if someone touched her on her chest or her "front bottom part," that would be a "bad touch."

The victim acknowledged that when she was in the seventh grade, she knew a man named "J. D." During cross-examination of the victim, "J. D." was identified as J. D. Gaines. She stated that J. D. was a "CB friend" of the [petitioner]'s. She testified that the [petitioner] drove for a trucking company. The victim reported that the [petitioner]'s CB nickname was A.K., which stood for "Arizona Kid," and that her own CB nickname was "Blondie." The victim recalled meeting J. D. on one occasion at a Waffle House, and she also recalled him visiting her house.

The victim testified that on one occasion while she was in the seventh grade, she and the [petitioner] helped J. D. move. She recalled that the [petitioner] drove his green Ford truck. The victim stated that J. D. moved from a house to a duplex and that the move took place during the daytime. She identified in court photographs of both J. D.'s house and his duplex. The victim recalled packing boxes for J. D. and seeing the boxes being loaded into the [petitioner]'s truck. She testified that the boxes were then taken to J. D.'s duplex.

The victim testified that once at the duplex, she unpacked boxes in different rooms. She testified that at one point she went into the bedroom with the [petitioner] and J. D. When asked what happened in the bedroom, the victim stated, "They touched me." She recalled that the [petitioner] was the first one to touch her and that he touched her on the chest on top of her clothes. The victim testified that J. D. then touched her chest underneath her clothes. The victim testified that the [petitioner] and J. D. "made [her] suck their front private." She stated that the [petitioner] forced her to perform the act first. The victim reported that the [petitioner] grabbed her neck

and pushed her head down. She testified that the [petitioner] "made [her] move [her] head back and forth." The victim testified that after performing oral sex on the [petitioner], "he stuck his front private in [her vagina]." She explained that the [petitioner] pushed her backwards onto the mattress and got on top of her. The victim testified that the [petitioner] took off her pants and underwear. She stated that the [petitioner] was wearing underwear.

The victim testified that the [petitioner] stopped the rape when "he came." She explained, "White stuff came out of his front private." She stated that the [petitioner] ejaculated onto her stomach. The victim testified that after the [petitioner] was finished, "he shrugged his head at J. D.," who had been in the room the entire time. She testified that J. D. then "did the same thing." She stated that J. D. "forced [her] to suck his front private." The victim explained that J. D. "grabbed the back of [her] neck, the same place [the petitioner] did." She testified that J. D. also made her move her head back and forth. The victim testified that after performing oral sex on J. D., he "stuck his front private in [hers]" and "moved back and forth." She recalled that J. D. stopped when "he came." She explained that "white stuff came out of his front private" onto her stomach. The victim recalled that J. D. also "put his mouth on [her] front private" and "moved his tongue in a circle."

The victim testified that after the encounter with the [petitioner] and J. D., she cleaned off her stomach, got dressed, and "finished unpacking the truck." She testified that neither the [petitioner] nor J. D. said anything to her. She recalled that it was night when they finished unpacking. The victim testified that before she went with the [petitioner] to help J. D. move, the [petitioner] told her that "J. D. was going to make [her] suck his dick." The victim testified that both the [petitioner] and J. D. were in the room during the entire encounter.

The victim testified that a condom is "something a guy puts on his front private to make sure a girl doesn't get pregnant." She stated that neither the [petitioner] nor J. D. wore a condom when they sexually penetrated her. The victim reported that she started her period when she was nine years old. She recalled that the incident at J. D.'s duplex took place while she was in the seventh grade. She testified that she was attending McMurray Middle school at the time. The victim testified that she previously called the [petitioner] "dad," but she now calls him Bill.

On cross-examination, the victim testified that she lived with her birth mother, Pamela, until she was eight years old, and then she went to live with the [petitioner] and his wife. She stated that she has a brother named Chris who also went to live with the [petitioner] and his wife. The victim testified that Chris now lives with their birth mother.

The victim testified that she had attended North Parkway Middle School for two weeks and that prior to attending North Parkway, she had attended Selmer Middle School. She stated that she attended Selmer for half of her eighth-grade year, and prior to that, she had attended McMurray Middle School. The victim could not remember the name of her teacher at Selmer Middle School.

The victim maintained that she helped J. D. Gaines move only once. She stated that Gaines moved on one other occasion, and she watched his children. She stated that her brother did not help with the move. The victim testified that during the rape, Gaines's girlfriend, Debbie, was at work. The victim testified that she was interviewed a couple of times by police, but she admitted that she did not mention the encounter in this case.

The victim testified that after the [petitioner] was arrested, her brother went to Kansas to live with their birth mother. She reported that the [petitioner] and his wife divorced, and the victim stayed with her aunt. The victim testified that she wanted to go to Kansas also, but her aunt wanted her to stay with her in Tennessee. She identified in court two letters that she had written to her mother. One of the letters, dated June 17, 2000, stated, "Dear Mom, I want to come home. I hate her." The victim acknowledged that she wrote, "She beats the shit out of me." The victim also acknowledged that in the other letter, she wrote, "She beats me when I talk to you. She leaves bruises. Get me out of here. I can't take it anymore. I hate it here. Get me out, please. I want out."

The victim testified that she was punished whenever she did not do what Carol wanted her to do. She stated that the last time her aunt "beat" her was when the [petitioner] was still living in her aunt's home. However, she admitted that she wrote at least one of the letters after the [petitioner] had left the home. The victim testified that she wanted to live with her birth mother. She acknowledged that if she told the court that the [petitioner] did not rape her, she would be punished. The victim testified that she lived in Nashville and that she lived in Nashville the previous summer. On re-direct examination, the victim maintained that she told the truth about the incident at the Gaines home.

Sue Ross testified that she is a pediatric nurse practitioner at Our Kids Center in Nashville, Tennessee. She stated that Our Kids is an outpatient clinic of General Hospital that is designed primarily to perform medical evaluations of children who are alleged to have been sexually abused. Ross testified that between 600 and 800 children are evaluated at the clinic each year. She testified that as a nurse practitioner, she performs physical examinations on children and is capable of diagnosing common childhood illnesses. The defense stipulated that Ross is an expert in the field of child sexual abuse evaluations.

Ross testified that she is one of two nurse practitioners in the clinic who perform physical evaluations on children. She stated that the clinic also has a "psycho-social staff," which includes two social workers and a child psychologist. The staff gathers information about the child and often interviews the child and whoever brings the child into the clinic. Ross testified that she had been at Our Kids Center for ten years and that she had examined approximately three thousand children. She testified that records are kept on all of the children who are examined at the clinic.

Ross testified that a "head to toe examination" that "includes a focus on the genital area" is performed on children brought into the clinic who are suspected of being sexually abused. She reported that for the genital area, a culposcope is used. Ross testified that a culposcope is "nothing more than a medical term for . . . a pair of binoculars that's mounted on a stand, with a light source, and a 35mm camera attached to it." Ross testified that the culposcope magnifies the genital area so that it is easier to see. Ross testified that photographic slides of most children who are examined are maintained at the clinic.

Ross testified that the victim in this case was examined at Our Kids Center in May 2000. She stated that another pediatric nurse practitioner at the clinic, Barbara Speller-Brown, performed the exam on the victim. Ross reported that Speller-Brown moved to Washington D.C. in August 2000. However, Speller-Brown took notes on the examination which Ross reviewed before testifying. Ross stated that she also reviewed slides that were taken of the victim's genital area.

According to Ross, Speller-Brown noted that she observed injury to the victim's hymen and that there was "very little hymenal tissue in a certain position of the hymen." Ross testified that if the face of a clock were to be superimposed on the victim's genital area, the victim was missing hymenal tissue from four o'clock to seven o'clock. She reported that the hymen "is basically a piece of tissue that serves . . . for lack of a better term, sort of a gateway . . . into the vagina." Ross explained that when most people think about the female's external genitalia, they visualize the labia, or the outer lips. She stated that when the labia is parted, there is an opening that leads into the vagina. Ross testified, "Before you actually get to the vagina, though, in prepubital and in adolescent children, you will have hymenal tissue." Ross then illustrated her testimony by using two slides of the victim's genital area.

Ross testified that the injury to the victim's vagina indicated that there was a "penetrating trauma to the area." She testified that the victim's aunt, Carol Zukowski, brought the victim to the clinic. Ross testified that medical histories were obtained from both the victim and Zukowski. Neither the victim nor Zukowski indicated that the victim had suffered from any injury other than sexual penetration. Ross testified that absent an accidental injury, sexual penetration was the most likely

explanation for the trauma. However, she testified that it was not possible to determine who caused the injury. Ross testified that the victim informed the clinic that she had been sexually penetrated by a person named Phillip. She stated that the victim did not indicate whether the penetration was consensual.

On cross-examination, Ross testified that there was no way to determine when the injuries to the victim occurred. She stated that the victim's aunt provided information that the victim had been forced to perform oral sex and was sexually penetrated by a man named Phillip Young in January 1999. Ross acknowledged that the incident could explain the victim's injury. She also acknowledged that sexual intercourse with J. D. Gaines could explain the injury.

Joseph Gaines testified that at the time of the [petitioner]'s trial, he was in jail for the rape of the victim. Gaines admitted that during the move of his residence in September 1999, he engaged in sexual acts with the victim. He also acknowledged that he had been charged in Florida with sexual abuse against his daughters, but that he was never convicted of those charges.

Gaines testified that he met the [petitioner] "on the CB radio" and that he had known the [petitioner] since around the middle of 1997. He stated that at some point, he worked with the [petitioner] at Brentwood Security. Gaines testified that his 'CB handle" was "J. D." and that most people knew him as "J. D." He stated that the [petitioner]'s "handle" was "A. K.," which stood for "Arizona Kid." Gaines testified that he also knew the victim. Gaines testified that the prosecution did not offer him any deals in exchange for his testimony and that he was giving his testimony because "the truth needs to be told."

Gaines testified that in the summer of 1999, he lived on Jacksonian in Hermitage, Tennessee. He stated that in September, 1999, he moved to a duplex on Lebanon Pike. Gaines testified that the [petitioner] and the victim helped him with his move. He stated that he asked the [petitioner] to help him move because the [petitioner] had a pickup truck.

Gaines admitted that he engaged in sexual acts with the victim in one of the bedrooms of the residence on Lebanon Pike. He stated that he performed oral sex on the victim and then vaginally penetrated her. Gaines testified that he ejaculated on the victim's stomach. He reported that the [petitioner] was present in the room when Gaines performed the acts on the victim. Gaines testified that the [petitioner] also engaged in sexual acts with the victim. He recalled that the victim performed oral sex on the [petitioner] and that the [petitioner] vaginally penetrated the victim. Gaines testified that while he was performing oral sex on the victim, the [petitioner] told him that "whatever [Gaines] was doing, to keep on doing it, because [the victim] was apparently liking it." Gaines testified that after he and the [petitioner] both raped

-7-

the victim, the [petitioner] told Gaines "that if it would have been his daughter, he wouldn't have done it." He identified in court a picture of the duplex where he and the [petitioner] raped the victim. Gaines testified that he did not wear a condom during the rape and that he did not notice if the [petitioner] wore a condom.

On cross-examination, Gaines testified that he moved at least three times between 1997 and 1999, but he maintained that the [petitioner] helped him move only once, when he and the [petitioner] raped the victim. Gaines stated that Rebecca Burnette was his step-daughter and that Elaina Gaines was his daughter. He testified that Burnette had myatonia dystrophy which affected the nerve endings of the muscles. He stated that Burnette also had learning disabilities, but she was able to graduate from high school. Gaines testified that in 1987 he was accused of raping Burnette. He did not recall allegations involving Elaina Gaines. However, he later admitted that he was arrested for molesting Elaina Gaines. Gaines acknowledged that on June 19, 2000, his children, Brady and Shania Gaines, were removed from his home. Gaines maintained that he never touched his own children.

Gaines testified that when he was first approached by police regarding the [petitioner], he did not tell them that he had sexually assaulted the victim or that he had seen the [petitioner] sexually assault the victim. Gaines testified that he then told police that the victim was the sexual aggressor. He stated that the victim was "grabbing [his] private parts" while he was trying to pack up his house and that he told her "no."

Detective David Zoccola testified that he works for the Davidson County Metropolitan Police Department in the youth services division and that he was assigned to the Child Physical and Sexual Abuse Unit. Zoccola testified that he had been a police officer for twenty-four years and that he had been investigating child abuse cases for three years. Zoccola testified that in May 2000, he was assigned to investigate this case. Prior to Zoccola being assigned to the case, Detective Chad Slagle had been investigating a case involving the victim. Zoccola testified that Slagle identified the [petitioner] and a man named Phillip Young as being suspects in the case. Zoccola recalled that Young was seventeen years old, lived in the same neighborhood as the victim, and was a friend of the victim's brother. According to Zoccola, Detective Slagle investigated a case in which Young was accused of approaching the victim on the street, forcing her into a ditch, and raping her. Zoccola testified that he interviewed Young and that Young "made admissions that he had numerous sexual encounters with [the victim]."

Zoccola testified that he was assigned to the case on May 15, 2000 when a second complaint was made to the police department regarding the victim. Zoccola testified that he spoke to the [petitioner] on May 16, 2000. He stated that sometime after speaking to the [petitioner], he spoke to the [petitioner]'s wife, Carol Zukowski.

According to Zoccola, Carol Zukowski provided police with a list of names of those who had had contact with the victim. The list included people in the "CB radio network." Zoccola testified that J. D. Gaines's name was on the list furnished by Carol Zukowski.

Zoccola testified that he interviewed Gaines in the parking lot of a Shoney's restaurant. He stated that as a tactical matter, he told Gaines that he was interested in obtaining information about the [petitioner]. Zoccola reported that Gaines told him that he and the [petitioner] had engaged in sexual acts with the victim at Gaines's duplex. According to Zoccola, Gaines said that he had performed oral sex on the victim and that he had engaged in sexual intercourse with the victim. Zoccola testified that Gaines also told him that he made the victim perform oral sex on him. Gaines told Zoccola that the [petitioner] had engaged in sexual intercourse with the victim on a day when the [petitioner] and the victim were helping Gaines move. Zoccola testified that he did not make any promises to Gaines in exchange for the information he provided. He stated that Gaines expressed remorse for what he had done to the victim.

On cross-examination, Zoccola testified that when he was assigned to this case, the [petitioner] was the primary suspect whom he was assigned to investigate. He testified that he interviewed the victim on May 16, 2000 and that there was no mention of any encounters involving Gaines and the [petitioner]. Zoccola testified that he was also present on May 17, 2000 when the victim had a forensic interview. He stated that during the May 17 interview, the victim mentioned inappropriate behavior by the [petitioner], but she did not mention Gaines.

Zoccola testified that after the [petitioner] was taken into custody on May 16, 2000, he did not return to his home with Carol Zukowski. He stated that Carol Zukowski retained custody of the victim, but the victim's brother, Chris, went to live with his birth mother in Kansas. Zoccola acknowledged that Gaines did not immediately admit to raping the victim or seeing the [petitioner] rape the victim. Zoccola also acknowledged that at one point in the interview, Gaines stated that the victim approached him about having sex.

Zoccola reviewed two letters written by the victim that were sent to the victim's birth mother, Pamela Crowson. Zoccola testified that he received the two letters by fax on June 27, 2000. He stated that he was made aware that according to a court order, custody of the victim was to be returned to Crowson. Zoccola acknowledged that the victim remains in the physical custody of Carol Zukowski. He testified that the victim was interviewed regarding the allegations she made against Carol Zukowski in her letters. On re-direct examination, Zoccola testified that his interview of the victim, during which she failed to mention Gaines or the [petitioner], occurred while the victim was still living in the [petitioner]'s home.

Chris Zukowski testified that the [petitioner] is his uncle and that he refers to the [petitioner] as "Dad." He stated that the victim is his sister and that Carol Zukowski is his aunt. Zukowski testified that he lived with the [petitioner] and Carol Zukowski for approximately eight years. He reported that in May 2000 he moved to Kansas to live with his mother. Zukowski testified that he was sixteen years old and that he was attending Winfield High School Diploma Completion Course.

Zukowski recalled helping J. D. Gaines move "kind of one and a half" times. He explained that the first time he helped, he just threw garbage away. Zukowski testified that the "half" move to which he referred occurred before spring or summer break in 1998 or 1999. He stated that he, the [petitioner], his aunt, and the victim all helped Gaines move. Zukowski testified that he also helped Gaines move in September 1999 immediately after school began. He recalled that he, the [petitioner], the victim, Zukowski's girlfriend (Abigail Diganazaday), Gaines's wife and two children all helped with the move. He testified that his girlfriend had since moved back to Iran.

Zukowski testified that during the move, the victim "pretty much babysitted the two kids." He reported that they helped move about five or six "loads" of items to Gaines's new duplex. Zukowski testified that he did not go to the new house each time. He recalled that on one trip which occurred right before dusk, the [petitioner], Gaines, the victim and Zukowski's girlfriend went to the new home. He testified that they were gone about fifteen or twenty minutes. Zukowski recalled that when the victim returned, she helped do some more packing and helped take care of the children. He reported that the victim was happy. He testified that everyone went on the last "run" to the house.

Zukowski testified that the victim told him that Phillip Young had raped her. However, he testified that the victim never mentioned being raped while helping J. D. Gaines move. Zukowski testified that he and the victim were "pretty close." He recalled that when he and the victim lived together, they would "quite frequently" talk about sex. Zukowski believed that his sister would have told him if she had been raped. He testified that he had not seen the [petitioner] since the [petitioner] had been arrested.

Zukowski testified that when he and the victim first went to live with the [petitioner] and Carol Zukowski, Carol was kind to the victim. However, he stated that things changed when the family moved to Nashville. He recalled that Carol Zukowski began to spank the victim about two or three times a week, and that Carol Zukowski would not always paddle the victim on her bottom. He reported that the worst incident occurred when Carol Zukowski caused the victim to have a dislocated shoulder, a bloody lip, a black eye, and bruises on her arms and legs. Zukowski testified that he saw Carol Zukowski beat the victim with her fists four times. He

-10-

stated that the victim feared the beatings by Carol Zukowski and that the victim wanted to live with their real mother. Zukowski testified that the victim was easily manipulated by people. He stated that when Carol Zukowski would beat the victim, the victim would tell people that she had run into a wall or that she had been "roughhousing."

On cross-examination, Zukowski testified that he left Nashville in May 2000. He stated that he last saw Carol Zukowski beat the victim about four weeks before he left Nashville. Zukowski testified that he tried to stop Carol Zukowski from beating the victim, but a man named John Potts prevented him from entering the victim's room. He stated that he got in trouble for the beating because Carol Zukowski "rearranged" the story. Zukowski acknowledged that he did not trust J. D. Gaines and that Gaines was "perverted." He testified that he only helped for one day of the move. However, even though he stated that he and the [petitioner] were close and that he called the [petitioner] "dad," Zukowski testified that he never mentioned anything to the [petitioner] about Gaines. On re-direct examination, Zukowski testified that the last time he talked to the victim was in August 2000. He stated that since then, Carol Zukowski has not allowed him to talk to the victim.

The victim's biological mother, Pamela Crowson, testified that the [petitioner] is her brother. She stated that she spoke to the victim after the victim testified at the [petitioner]'s trial. Crowson recalled that she, the victim, Christopher Zukowski, and Carol Zukowski walked to see Crowson's dog that was in her truck. She testified that she and the victim were a few steps away from Carol Zukowski and Chris Zukowski when the victim told her, "Carol's making me say things that are not true." Crowson stated that the victim had made similar statements in the past. She testified that the victim also told her that she wanted to go with Crowson.

On cross-examination, Crowson testified that at one time she was close to the [petitioner], but she stated that she was no longer close to him. She stated that she came to the [petitioner]'s trial because defense counsel wanted her son, Chris Zukowski, to testify. Crowson acknowledged that defense counsel wired her money to come to Nashville. She believed that her son did not like Carol Zukowski. However, she stated that Chris Zukowski and Carol Zukowski walked to her car together, while she and the victim walked together. Crowson reported that the victim had been living with Carol Zukowski and the [petitioner] for approximately four or five years. She testified, "Detective Zoccola is a liar." She also stated that the victim told her that she was lying. Crowson testified that she called Detective Zoccola on multiple occasions to tell him that Carol Zukowski was beating the victim. She testified that she had not been in Nashville for five years and that she could not afford to come visit her children. However, she stated that she wanted the victim to live with her.

On re-direct examination, Crowson testified that the Public Defender's Office wired her $ 100.00 to travel to Nashville for the [petitioner]'s trial. She stated that she sent a "court paper" from Arizona to Cliff Banister at the Department of Human Services indicating that she had custody of the victim. Crowson also testified that she sent money to her children so they could visit her in Arizona. She stated that she had not seen the victim in a year and a half because Carol Zukowski would not let her have any contact with the victim.

In rebuttal, the victim was called to testify. The victim testified that after her original testimony, she spoke to Pamela Crowson. However, the victim denied telling Crowson that she was being forced to say things that were not true. On cross-examination, the victim testified that she was going home with Carol Zukowski after the trial.

B. Sentencing Hearing

Detective David Zoccola testified that he was assigned to this case on May 15, 2000 following an offense report involving the victim. According to Zoccola, the report was initiated by two brothers on May 14, 2000. He testified that he could not locate the person that filled out the report, but he was able to locate a witness named Andrew Herps who was listed in the report.

Zoccola reported that he contacted Herps, and Herps had a conversation with the [petitioner] that was recorded by police. During the conversation, the [petitioner] agreed to allow Herps to bring three or four other individuals to the [petitioner]'s house to engage in sex with the victim. Zoccola testified that during the conversation, Herps and the [petitioner] talked about how "it" had to be done by four o'clock because that was when the [petitioner]'s wife got home. Zoccola stated that Herps and the [petitioner] joked about a bet the [petitioner] made with Herps that he would pay him $ 5.00 if he could make the victim have an orgasm before the boys did. He testified that during the conversation the [petitioner] said that he had to be in the home when the acts occurred.

Zoccola testified that after hearing the taped conversation between Herps and the [petitioner], he realized that the victim's living arrangements had become an emergency situation and removed the victim from the home. He recalled that the [petitioner] was taken to the police station that day for a "fairly lengthy interview." Zoccola testified that the [petitioner] described the victim as a caring, trusting, loving and truthful child. He reported that the [petitioner] stated that the victim had an illness when she was young and that a fever relating from the illness caused her to be "very slow." Zoccola testified that he explained to the [petitioner] why he was being questioned and that he gave the [petitioner] about a five or ten minute explanation of various things that he believed that the [petitioner] had been doing to the victim.

Zoccola testified that after the explanation, the [petitioner] basically said, "I never watched."

According to Zoccola, the [petitioner] confirmed that Andrew Herps was bringing other males into the [petitioner]'s home and that the [petitioner] was aware that the other males were coming to the house to engage in sexual intercourse with the victim. Zoccola testified that the [petitioner] confirmed that over a two-year period, approximately twenty-five men came into the home to have sex with the victim. He stated that the [petitioner] indicated that the victim was eleven and twelve years old when the rapes occurred.

Zoccola testified that all of the witnesses stated that the [petitioner] was present in the home when the sexual acts occurred. Zoccola testified,

[The petitioner] laid out . . . this situation where he felt like [the victim] was going to be sexually active. So, knowing that he didn't have much control over that, according to him, he, basically, talked or discussed with [the victim], look I know you're going to have sex. If you're going to have sex, we'll do it here in the home, where I can basically, monitor things. And he . . . began to describe that when the sex would go on, he would be in the next room or out in the den. It's a rather small house. And I guess the easiest way to say it is that he would supervise things. He would . . . be able to hear and monitor if things got out of hand. And he even went down a list of things that he would and would not allow. He would not allow any of the men to physically abuse her. He would not allow any of the men to hit her. He would not allow more than one man at a time having sex. He would not allow any foreign objects. He would not allow several other things, that I would have to look at the list. But he, basically, went down, I guess, the rules that . . . these guys would have to go by when they engaged with sex.

Zoccola testified that the [petitioner] denied having sex with the victim. He stated that the [petitioner] indicated that there were "numerous times" that as many as three or four guys would come to the house with the intention of having sex, but the men would have to go into the victim's room separately to have sex with the victim. Zoccola testified that the [petitioner] had a big C.B. radio antenna at his house and that the whole family would talk on the radio. He stated that the [petitioner] met a number of his friends by talking on the radio. Zoccola testified that the [petitioner]'s family's social life revolved around people whom they had met on the radio. The group of men with whom the [petitioner] associated because of the radio included John Potts, Larry Dowell, and Joseph Cain, who were all charged in this case.

Zoccola testified that approximately seven juveniles were also charged in this case. Zoccola stated that according to the witnesses he interviewed, the rapes had

been occurring for over two years. He testified that the types of acts included predominately oral sex, but "there was a lot of mention of intercourse." Zoccola testified that the [petitioner] admitted that "about the only thing he wouldn't allow was anal sex." He recalled that the [petitioner] stated that a lot of the sexual activity began to occur while he was home with an injury. Zoccola testified that the victim would have been eleven or twelve years old and possibly even younger when the acts occurred. He stated that the acts continued after the incidents in this case until the time the [petitioner] was arrested. On cross- examination, Zoccola testified that one of the men, John Potts, who was a member of the C.B. club, was also Carol Zukowski's lover.

Frankie Cowan, the Clinical Director of the Nashville Child Advocacy Center in Nashville, testified that she has been the director for four years. She stated that her responsibilities at the center were to supervise two clinical therapists and two forensic interviewers. Cowan testified that she also engaged in therapy with children and handled a support and education group for parents of children who have been sexually abused. She stated that she had been working with victims of child abuse for approximately eight years and that she had been working in the field of mental health for twenty years. Cowan testified that during her career, she had worked with about four or five hundred children. She testified that she had a master's degree in psychology.

Cowan testified that she counseled the victim eight times beginning in May 2000 until the victim relocated to another city with her aunt. She reported that the victim exhibited symptoms of post-traumatic stress disorder. Cowan testified that the victim was suffering from nightmares and had "a lot of generalized fears," such as the loss of a family member. According to Cowan, the victim was also fearful about talking about the abuse because she thought it was her fault. She stated that the victim did not know who to trust and that the victim ""had, basically, no family support." Cowan testified that the victim had not seen her natural mother in four years and had been entrusted to the uncle who raped her. Cowan testified that the victim needed love and affection, but confused these emotions with sexual activity. She stated that the victim had very poor judgment regarding whom to trust and how to deal with other people. Cowan testified that these traits are often seen in children who exhibit the worst long-lasting effects of sexual abuse. She explained that the abuse was very confusing to the victim especially because it was done by her caregiver.

Cowan opined that when the perpetrator of sexual abuse upon a child is also the child's caregiver, the resulting betrayal of a "trusting relationship" between child and caregiver becomes an overriding factor in determining whether a child is "going to be permanently affected." She further testified that the betrayal by the [petitioner], coupled with the lack of family support, left the victim "a sitting duck for future

-14-

victimization of every type." Cowan stated that adult survivors of child sexual abuse often confuse affection and love with sexual activity and thus do not have good judgment in choosing partners. She testified that this was "one of the worst cases [she had] ever seen, as far as predicting what [the victim's] . . . future would be, as far as having healthy relationships with other people." Cowan stated that she did not expect the victim to lead a reasonable, normal life after the abuse.

On cross-examination, Cowan testified that she had received training on perpetrators and had counseled perpetrators in the past. She stated that frequently perpetrators are the victims of abuse. Cowan testified that when she met with the victim, the victim's family consisted mainly of her aunt and that they were moving residences. She reported that she did not have any contact with the victim since May or June 2000. However, Cowan stated that she was informed that the victim had been in a psychiatric hospital.

Dr. Joan Sliger testified that she had a doctorate degree in clinical psychology from Vanderbilt University and that she had been practicing psychology since 1975. Sliger reported that she worked for a couple of years at the Middle Tennessee Mental Health Institute after she obtained her master's degree but before she had obtained her doctorate degree. She testified that during that time, she performed forensic psychological examinations. Sliger reported that she returned to performing forensic evaluations about six or seven years prior to the trial in this case. She testified that her primary vocation is psychotherapy.

Sliger testified that she interviewed and tested the [petitioner] for about five and a half hours on one day. Sliger testified that the [petitioner] had some "history" that was very difficult for him to talk about. She stated that the [petitioner] indicated that when he was young, he and his brother had been sexually molested for a period of about two years by a man who was a friend of his parents. According to Sliger, the abuse began when the [petitioner] was approximately eight years old. She testified that the [petitioner] said that the police interviewed him and his brother about the abuse. Sliger reported that following the incident, the [petitioner]'s mother "cried a lot" and the [petitioner]'s father possibly developed a drug dependence. She stated that she thought that the [petitioner]'s perpetrator had molested approximately twenty-two victims.

Sliger testified that in cases of child sexual abuse, "it is most important to provide counseling to the victims." She stated that the [petitioner]'s father dealt with the rapes of his sons by pretending that it never happened. Sliger testified that the [petitioner] informed her that the victim's mother, the [petitioner]'s sister, was also a victim of rape. She stated that after his sister's rape, the [petitioner] directed his anger at his sister's rapist. Sliger testified that the [petitioner]'s rape caused him to believe that no one had any control over their own body. She stated that when she

interviewed him, the [petitioner] had never actually talked to anyone about his childhood rapes, and she explained that it would therefore be "hard to know how [his victimization and his treatment of the victim] related. She stated, however, that "statistically, you look for those things in a perpetrator."

Sliger testified that the [petitioner] was given a test called the MMPI which did not indicate that the [petitioner] had any sort of psychosis. She stated that the [petitioner] was bright, that he appeared to have "good sense," and that he was not "crazy." Sliger testified that she was "puzzled" by the results of the [petitioner]'s "paranoid scale." She reported that the [petitioner] scored exceptionally low, which indicated that he did not have any "suspiciousness" in him. Sliger testified that the abuse that the [petitioner] suffered as a child likely played some part in his abuse of the victim.

On cross-examination, Sliger acknowledged that she spoke to the [petitioner] on only one occasion for about five and a half hours. She stated that she obtained all of her information concerning the [petitioner] from the [petitioner] during that time and from documentation provided to her by defense counsel. She acknowledged that the abuse of the [petitioner] as a child did not excuse the [petitioner]'s behavior. She also stated that adults should be held accountable for their behavior.

State v. William Douglas Zukowski, No. M2001-02184-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 62, at **2-38 (Tenn. Crim. App. Jan. 31, 2003).

During the post-conviction hearing, the petitioner testified that he believed counsel failed to adequately investigate his case prior to trial. He said that there were medical records that could show that he was unable to drive at the time of the incident due to a broken left leg. Eleven hundred and seventy-eight pounds of steel tube had fallen on his leg, rendering him incapable of walking for eighteen months. He said he told counsel that he was bedridden during the time the crime was alleged, but counsel did not investigate. He said he told counsel about other witnesses that would have been helpful at trial, but they were not contacted. Specifically, he mentioned his ex-wife and his brother as possible witnesses, but counsel always told him he had not spoken to them yet.

The petitioner testified that he wanted an expert to examine the victim to determine whether she was competent to testify, but, to his knowledge, no attempt was made by counsel to examine her. He agreed that he entered a plea bargain on other charges after he was convicted following trial. He asked the court to vacate the plea so that he could proceed to trial. He said the outcome of the trial affected his decision to plead on the other counts, and he believed he was making a best interest plea. He said he was under the impression that a best interest plea did not have the legal effect of a guilty plea. He said he was not rational, was in a severe state of depression when he entered the plea, and did not fully understand what he was doing. He said that he suffered from Post Traumatic Stress Disorder from his military service and that it affected his judgment. He said that he was receiving treatment while in prison, that he was in a better mental state now, and that he would not have

entered the guilty plea. He said he was innocent and would not have done anything to harm the victim.

On cross-examination, the petitioner testified that he recalled telling the detective that he assisted the victim in engaging in sexual activity with multiple individuals prior to May of 2000. He said that he was ultimately responsible for not paying attention to what was going on. He acknowledged that he knew his confession would be brought up at trial. He acknowledged that he assisted Gaines in moving on two occasions. He said his counsel did produce testimony at trial that the petitioner was never alone with the victim and Gaines during the move. Trial counsel had the victim's brother transported from Arizona to Tennessee to testify as an alibi witness on his behalf at trial, but the jury did not credit the testimony of the witness. The petitioner did not tell the detective that he was injured at the time and did not have the opportunity to commit the offenses. He told the detective that the victim was a truthful and competent individual.

On re-direct examination, the petitioner said there were other witnesses that could have been called to testify on his behalf. He said that he spoke with the detective freely and voluntarily and that he drove himself to the police station. He said the detective never asked him about the events that occurred during the move. Counsel told the petitioner that he could testify but that it would not be a good idea because his testimony would open the door for other things that had nothing to do with this trial. The petitioner said that he should have testified because he could have cleared up a few misconceptions. At the conclusion of his testimony, the petitioner rested his proof.

The State called trial counsel, who testified that he had been a public defender from the time he passed the bar through the underlying case. When the case was tried, he had been a public defender for six or seven years. He said the petitioner was the subject of a thirty-eight count indictment that encompassed a variety of sexual activities alleged to occur over a broad spectrum of time. Some of the counts of the indictment were severed, and the counts involving the case that went to trial involved allegations that, on a particular day, the petitioner and Mr. Gaines engaged in a variety of sexual activities with the victim. Counsel testified that the particular incident was a single, discreet incident that occurred on one day, as opposed to some of the other counts in the indictment. This crime occurred on a specific day at a specific location.

Counsel met with the petitioner prior to trial, and they discussed a multi-point defense strategy. First, they had to show that the victim was not competent as a witness or that her memory was so bad that no one should take her seriously. Second, they had to show that Mr. Gaines was a reprehensible person and should not be taken seriously. Counsel said those two things had to happen for them to have much of a chance at prevailing. Counsel also said they had the victim's brother to testify that he was present at the time of the alleged events and that he did not see anything happen. Counsel said he did not recall discussing any injuries with the petitioner in relation to this trial.

Counsel recalled that the victim was vigorously impeached because she was unable to recollect much of anything. He said it was established that the victim was mentally retarded and had difficulty remembering things. The victim's brother testified that, on the day in question, there was

-17-

not sufficient time for the particular incidents to have taken place. After the conclusion of the trial, counsel did not give the petitioner any advice on the remaining charges against him. Counsel filed a motion for new trial and a motion for judgment of acquittal after the trial. Because counsel took a sabbatical from the public defender's office, a different public defender was assigned to represent the petitioner for his remaining charges.

On cross-examination, counsel said they tried the case as though the crimes happened on one day. He said it was possible that they happened on multiple days but, "in the realm of the courtroom," it was presented as though it all happened on one day. He said this approach made it was easier for him to defend because they had a witness, the victim's brother, who testified that the offenses could not have occurred on that day. Counsel recalled that it was possible the petitioner opined that he was unable to perform a sex act at the time, but counsel did not have an expert examine the petitioner to determine if he could perform a sex act. The petitioner never told counsel that he did not participate in the move of Mr. Gaines. The petitioner acknowledged that he helped Mr. Gaines move but denied that he had sex with the victim. Counsel did not recall any other alibi suggestions made by the petitioner. He did not recall the petitioner giving him any information worthy of investigation. He did not recall contacting Mr. Gaines' landlord or any of his neighbors. Counsel did not consider calling the petitioner's ex-wife because she was incredibly hostile toward the petitioner at that point.

Next, the State called the counsel who represented the petitioner for the entry of his four guilty pleas. She testified that she had been a public defender for nine years and that she began to represent the petitioner during trial counsel's sabbatical. Plea counsel testified that she was not involved in the petitioner's trial. She was aware that the petitioner had made incriminating statements to the detective with regard to the sexual activity of the victim. She was further aware of statements from charged and uncharged co-defendants implicating the petitioner as participating, facilitating, and setting up sexual activity with the victim. The petitioner had been sentenced to 125 years when she was assigned to represent him. The petitioner seemed agreeable to settle the remaining counts against him given the time he had already received. They reached an agreement with the State for an additional twenty-five-year sentence, to be served concurrently with his existing sentence. They discussed the remaining counts and the possible sentences on each count. She believed the twenty-five years, concurrent to the time he was already serving, was a favorable resolution to the remaining charges. She never considered that his plea was anything other than knowing and voluntary. Plea counsel would not have brought the petitioner to court to plead if she did not believe he was doing so voluntarily.

Plea counsel testified that it was likely the conviction and subsequent 125-year sentence was a factor in his decision to plead. She said that, had the petitioner been acquitted at trial, he probably would not have entered his plea to twenty-five years, concurrent. Plea counsel said that the petitioner never expressed any dissatisfaction with her representation and said it was not her practice to discuss other counsel's representation with clients. She said she tells them that, if they are unhappy with their representation, there is another remedy for that dissatisfaction, eventually. Plea counsel did not have any concerns about the petitioner's competency to enter his plea.

On cross-examination, plea counsel reiterated that she does not discuss a client's dissatisfaction with prior counsel. She did not recall whether the petitioner expressed a lack of satisfaction with the public defender's office. She said she did not see anything that led her to believe the petitioner was suffering from any mental illness or disorder.

Analysis

The petitioner argues that he received ineffective assistance of counsel and specifically contends that counsel was ineffective for failing to investigate (1) his medical records which would demonstrate that he was unable to perform the alleged acts; and (2) the proposed alibi witnesses. The petitioner also argues that the post-conviction court erred in relying on trial counsel's testimony because he said he did not remember multiple things.

This court reviews a claim of ineffective assistance of counsel under the standards of Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), and Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner has the burden to prove that (1) the attorney's performance was deficient, and (2) the deficient performance resulted in prejudice to the petitioner so as to deprive him of a fair trial. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). The failure to prove either deficiency or prejudice justifies denial of relief; therefore, the court need not address the components in any particular order or even address both if one is insufficient. Goad, 938 S.W.2d at 370. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

The test in Tennessee to determine if counsel provided effective assistance is whether his or her performance was within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. The petitioner must overcome the presumption that counsel's conduct falls within the wide range of acceptable professional assistance. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; State v. Honeycutt, 54 S.W.3d 762, 769 (Tenn. 2001). Therefore, in order to prove a deficiency, a petitioner must show "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065).

In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002) (citing Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997); Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The petitioner contends that counsel failed to investigate certain medical records that could have shown his inability to commit the underlying crimes because of an injury he sustained to his left leg. He argues that this leg injury would have raised a reasonable doubt to the jury that he was unable to commit these acts. However, the petitioner has not demonstrated how this evidence would have undermined confidence in the outcome of the case. Trial counsel testified that the petitioner did not assert his injury as a defense to the charges while counsel was preparing for trial. The petitioner has not proved that the counsel's performance was deficient or that the counsel's performance resulted in prejudice so as to deprive him of a fair trial. He has not provided any medical records on appeal and presented none during the post-conviction hearing. We conclude that the petitioner has not met his burden of proof and, therefore, is not entitled to relief on this issue.

Next, the petitioner argues that trial counsel failed to contact certain witnesses he contends would have been beneficial to his cause at trial. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Scott v. State, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996). As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness resulted in the denial of critical evidence which caused the petitioner prejudice. Black, 794 S.W.2d at 757. Neither the trial court nor this court can speculate on what a witness's testimony might have been if introduced by counsel. Id. The petitioner failed to call any of these proposed witnesses during the post-conviction hearing and has failed to show any prejudice. This issue is also without merit.

In his last issue, the petitioner contends the post-conviction court erred by relying on trial counsel's "weak" testimony. It is the function of the post-conviction court to determine the credibility of witnesses and the weight and value of their testimonies brought forth in an evidentiary hearing. See Henley, 960 S.W.2d at 579. Here, the post-conviction court found the testimony of trial counsel to be credible and concluded that his representation was effective. The petitioner has failed to demonstrate that the evidence preponderates against the finding of the post-conviction court. Therefore, he is entitled to no relief on this issue.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE